### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LJM PARTNERS, LTD. and TWO ROADS
SHARED TRUST,

        Plaintiffs,

    v.

BARCLAYS CAPITAL INC., DRW
SECURITIES, LLC, MORGAN STANLEY &
CO. LLC, AKUNA SECURITIES LLC, CTC
LLC, IMC-CHICAGO, LLC (d/b/a IMC
FINANCIAL MARKETS), OPTIVER US
LLC, and VOLANT LIQUIDITY, LLC,

        Defendants.

Nos. 19 CV 368 and
20 CV 831

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Plaintiffs LJM Partners, Ltd. and Two Roads Shared Trust filed suit against eight firms for allegedly manipulating the Volatility Index in violation of the Commodity Exchange Act. Plaintiffs allege that defendants flashed quotes on SPX Options to influence the calculation of the VIX. These quotes caused the VIX to increase out of proportion with the S&P 500's actual volatility and caused artificially high prices of options on S&P 500 Futures and E-minis, the two financial instruments in which plaintiffs made their trades. When the market conditions caused the plaintiffs to make mitigating trades, they had to do so at an artificially high price, which, in turn, caused their futures clearing merchant to make a margin call. All of this caused LJM and Two Roads to incur significant losses.

Defendants move to dismiss LJM's complaint for lack of standing under Rule 12(b)(1) and to dismiss LJM and Two Roads's complaints for failure to state a claim under Rule 12(b)(6). Because LJM has not adequately alleged that it has suffered an injury-in-fact, its complaint is dismissed without prejudice. Two Roads's complaint is dismissed for untimeliness; it has not demonstrated the diligence necessary to benefit from equitable tolling, so its claims are barred by the statute of limitations.

## I.  Legal Standards

Plaintiffs in federal court must have Article III standing, which means they must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Plaintiffs bear the burden of establishing their standing. *Flynn*, 39 F.4th at 952. In response to a factual challenge to standing, a "court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). When reviewing a facial challenge to the plaintiffs' standing, however, "the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiffs." *Id.*

"Plausibility is the basic test for pleadings on a motion to dismiss." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 628 (7th Cir. 2023). To determine whether a complaint states a claim, a court must identify the well-pleaded factual allegations

and ask whether those allegations "plausibly give rise to an entitlement of relief." *Silha*, 807 F.3d at 174 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Complaints alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This pleading standard requires the plaintiff to "plead the first paragraph of any newspaper story, i.e., the who, what, when, where, and how of the fraud." *Lanahan v. County of Cook*, 41 F.4th 854, 862 (7th Cir. 2022). Allegations of a person's state of mind may be alleged generally. Fed. R. Civ. P. 9(b).

The Commodity Exchange Act authorizes civil suits against those who defraud, cheat, or deceive another person, or who manipulate prices or use manipulative or deceptive devices in connection with the sale of commodities. *See* 7 U.S.C. §§ 6b, 6c, 9, 13, 25; *see also* 17 C.F.R. §§ 180.1, 180.2. The 2010 Dodd-Frank amendments to the CEA added a "manipulative-device" claim under Section 6(c)(1) of the CEA and prompted the CFTC to promulgate new regulations on the two manipulation claims— 17 C.F.R. § 180.2 for price manipulation claims and 17 C.F.R. § 180.1 for manipulative-device claims. *See Ploss v. Kraft Foods Group, Inc.*, 197 F.Supp.3d 1037, 1051–53 (N.D. Ill. 2016) *and CFTC v. Kraft Foods Group, Inc.*, 153 F.Supp.3d 996, 1006–07 (N.D. Ill. 2015) (both providing legislative history and context for change in CEA's anti-manipulation provisions after 2010 Dodd-Frank Amendments).

Some courts apply Rule 9(b) when the alleged manipulation "sounds in fraud" because it involves an explicit misrepresentation and Rule 8(a) when the manipulation was effectuated through market power. *See Ploss*, 197 F.Supp.3d at

1057 (collecting cases); *Premium Plus Partners, LP v. Davis*, No. 04 C 1851, 2005 WL 711591, *15 (N.D. Ill. Mar. 28, 2005); *see also In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 180–81 (2d Cir. 2013) (acknowledging case-by-case approach to determining pleading standard for price manipulation claims). Other courts say that all manipulation claims are fraud claims and therefore must be pled with particularity under Rule 9(b). *See In re Amaranth Natural Gas Commodities Litigation*, 612 F.Supp.2d 376, 382 (S.D.NY. 2009) (applying Rule 9(b) to price manipulation claim).

Manipulation is fraudulent whether achieved through misrepresentation, market power, or a device. "Fraud has been defined to be any *kind of artifice by which another is deceived.* Hence, all surprise, trick, cunning, dissembling, and other unfair way that is used to cheat any one, is to be considered as fraud." *Fraud*, Black's Law Dictionary (11th ed. 2019) (quoting John Willard, *A Treatise on Equity Jurisprudence* 147 (Platt Potter ed., 1879)). Manipulation is "intentional or willful conduct designed to deceive or defraud investors." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (analyzing Rule 10b-5 and the Securities Exchange Act). "Fraud," "manipulation," and the rules against them are attempts to describe, and then prevent, an individual from gaining an advantage by cheating the market. Even without a written or verbal misrepresentation, an investor can misrepresent its true belief about the value of a stock or commodity by engaging in trading practices that do not reflect how it thinks supply and demand will set price, i.e., taking actions to manipulate the price. *See Sullivan v. Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) ("'[M]arket

manipulation,' a term that refers to tactics by which traders, like monopolists, create artificially high or low prices, prices that do not reflect the underlying conditions of supply and demand.") (internal citation omitted) (Securities Exchange Act); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) ("In identifying activity that is outside the natural interplay of supply and demand, courts generally ask whether a transaction sends a false pricing signal to the market.") (Securities Exchange Act).

Rule 9(b) applies to all claims alleging fraud, and that includes all practices that cheat the market, whether they are termed price manipulation or a manipulative device. What Rule 9(b) requires will vary depending on the nature of the fraud; if there are no explicit misrepresentations, then the plaintiff need not allege the time and place of representations. In accord with *Kraft Foods* and *Ploss*, I find that a complaint alleging a manipulative-device claim can meet Rule 9(b)'s requirements by alleging "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the [financial instrument] at issue." *Kraft Foods*, 153 F.Supp.3d at 1012; *Ploss*, 197 F.Supp.3d 1057; *see also ATSI Commc'ns*, 493 F.3d at 102 (discussing Rule 10b-5 manipulative-device claim).

## II.  Background

### A.  The Parties

LJM Partners, Ltd. was an Illinois corporation that served as a Commodity Trading Advisor and Commodity Pool Operator, managing 50 accounts on behalf of

investors. [144] (LJM) ¶¶ 1 n.2, 22.[1] The accounts included commodity pools, individual accounts, and limited partnership funds for which LJM served as general partner. [144] (LJM) ¶ 1 n.2. Two Roads Shared Trust was a Delaware statutory trust; the Preservation Fund, the entity that made the transactions at issue, was a mutual fund organized as a series of shares of beneficial interest in Two Roads. [152] (Two Roads) ¶¶ 1 n.2, 22.

Defendants Barclays Capital Inc., Morgan & Stanley & Co. LLC, DRW Securities, LLC, Akuna Securities LLC, CTC LLC, IMC-Chicago, LLC, Optiver US LLC, and Volant Liquidity, LLC , served as "market makers" for SPX Options traded on Chicago Board Options Exchange. [144] (LJM) ¶¶ 24–32.

## B. Types of Derivatives

The financial instruments at issue in this case were all derivatives—meaning their value is based on the value of something else.[2] An option gives the buyer the right, but not the obligation, to buy or sell a commodity or financial instrument at a predetermined price at or before a specific time, the "expiration" date. [144] (LJM) ¶ 41. An option to buy the underlying asset is a "call" and an option to sell is a "put." *Id*. The predetermined price is called the "strike price." *Id*. The entity that owns the

---

[1] Bracketed numbers refer to the entries on the district court docket for: 19-cv-00368 (LJM), 20-cv-00831 (Two Roads), and 18-cv-04171 (VIX MDL). Page numbers refer to the CM/ECF header placed at the top of filings. All facts are taken from Plaintiffs' Third Amended Complaints, [144] on the LJM docket and [152] on the Two Roads docket, unless otherwise noted. Statements from the plaintiffs' complaints are taken as true for purposes of the motion to dismiss.

[2] *See* "Derivative," Commodity Futures Trading Commission Glossary, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.

option (or "option holder") will decide whether not to exercise the option depending on whether the strike price is above or below the market price at the time of expiration. [144] (LJM) ¶ 43. If the holder has a call option and the strike price is below the market price, then the option is "in-the-money" and will likely be exercised. *Id*. If the holder has a call option and the strike price is above the market price, then the option is "out-of-the-money" and will likely not be exercised. *Id*. ¶ 44. The reverse holds true for put options. *Id*. ¶¶ 43–44. A futures contract is similar to an options contract, except the buyer *must* buy or sell the underlying asset at a predetermined price on a fixed date in the future. *Id*. ¶ 45. The buyer of a futures or option contract pays a "premium" to the seller. *Id*. ¶ 46. The derivatives in this case were all "cash-settled," meaning that if the holder decides to exercise the option, the seller pays the holder the difference in the strike price and the market price rather than delivering a product or financial instrument. *Id*. ¶¶ 42, 53, 55, 57.

The three derivatives at issue were derived from the S&P 500, an index of approximately 500 U.S. stocks listed on either the NYSE or NASDAQ. [144] (LJM) ¶¶ 47, 50. An SPX Option was an option contract based on the value of the S&P 500 and was traded on the Chicago Board Options Exchange. *Id*. ¶ 51. They could only be exercised at the expiration date. *Id*. "SPX Options can be in-, at-, or out-of-the-money at any given point in time, depending on the market's current expectation of the S&P 500's value in the future … For example, the at-the-money price for an SPX Option that expires in 30 days reflects the market expectation of the level of the S&P 500 in 30 days' time." *Id*. ¶ 52.

An option on S&P 500 Futures was a derivative of a derivative—the underlying asset was one S&P 500 Futures contract, which was a futures contract based on the S&P 500 Index. [144] (LJM) ¶ 54. At the expiration date, the holder of an in-the-money option on S&P 500 Futures would receive an S&P 500 Futures contract at the strike price (and if the option is in-the-money, then the futures contract is also in-the-money), which settles to cash. *Id*. ¶ 55. Like the SPX Option, an option on S&P 500 Futures was also a prediction of where the S&P 500 would be at the time of the expiration. The E-mini S&P 500 Futures was a smaller, one-fifth sized version of the S&P 500 Futures contract. *Id*. ¶ 57.

Because all three financial instruments (SPX Options, options on S&P 500 Futures, and E-mini S&P 500 Futures) were based on the S&P 500 Index, they were highly correlated and moved in tandem. [144] (LJM) ¶ 58. E-minis moved in lockstep with the S&P 500. *See id*. ¶ 59, Figure 4. SPX Options cash-settled to the value of the S&P 500. *Id*. ¶ 61. Options on S&P 500 Futures settled to S&P 500 Futures that cash-settled to the value of the S&P 500. *Id*. All three were electronically traded, so investors traded the three simultaneously, arbitraging away any temporary price differentials. *Id*. ¶ 58.

Because all three financial instruments were a bet on what the S&P 500 would be, they were all affected by the expected volatility of the S&P 500—the market's guess of how much the S&P 500 will change in the future. [144] (LJM) ¶ 62. Estimates of the S&P 500's future volatility were incorporated, as "implied volatility," into the formula used by investors to price the options. *Id*. When the S&P 500's expected

volatility was higher, all three financial instruments increased in price in a similar proportion. *Id.* ¶ 63, Table 1. An effort to manipulate the price for SPX Options or an effort to manipulate the perception of volatility in the market could directly influence the prices for options on S&P 500 Futures and E-minis. *See id.* ¶ 64.

### C. The VIX and Alleged Vulnerability to Manipulation

The VIX was an index intended to measure the expected volatility of the S&P 500, calculated and published by Cboe every fifteen seconds during regular and extended trading hours. [144] (LJM) ¶¶ 65–66. The VIX was higher when the market was expected to be more volatile and lower when the market was expected to be more stable. *Id.* ¶ 65. Because the VIX was proprietary to Cboe, the exact timing of the calculation was not disclosed. *Id.* ¶ 66.

Cboe shared the general method and formula for calculating the VIX and the midpoint of bid-ask quotes for SPX Options was a major input of the formula. [144] (LJM) ¶ 67. A "bid" is the price at which market participants are willing to buy an instrument; an "ask" is the price at which they are willing to sell that instrument; and the midpoint between the two is a common reference. *Id.* ¶ 66 n.17. Only Cboe-designated market makers could provide quotes for bids and asks on SPX Options. *Id.* ¶ 67. Defendants were eight of the seventeen Cboe-approved market makers providing bid-ask quotes on SPX Options on February 5 and 6, 2018. *Id.* The price for SPX Options was understood to reflect the market's expectation of what the S&P 500 would do in the future. *Id.* ¶¶ 68, 70.

Only SPX Options that had more than 23 and less than 37 days to expiration were used to calculate the VIX. [144] (LJM) ¶ 71. Within that set, the formula only considered out-of-the-money options with non-zero bid prices. *Id.* ¶ 75. The set was further narrowed by the "two-zero bid" rule. *Id.* ¶ 76; *see also* Figure 5. Starting with the at-the-money strike price, call SPX Options were considered at ever higher strike prices until there were two strike prices with zero bids in a row. *Id.*; *see also* Table 2. Put SPX Options were included at ever *lower* strike prices until there were two zero-bid strike prices in a row. *Id.* The VIX was calculated using the midpoint of bid-ask prices for the SPX Options in the above-defined set. *See id.* ¶¶ 74, 77, Figure 5.

Plaintiffs allege that defendants manipulated the VIX in two ways. First, that defendants quoted inflated bid-ask prices for out-of-the-money SPX Options so as to increase the midpoints used to calculate the VIX. [144] (LJM) ¶ 78. Second, plaintiffs allege that defendants provided quotes on previously zero-bid SPX Options so that more bid-ask quotes were included in the calculation. *Id.* ¶¶ 78–79.

### D. Events of February 5 and 6, 2018

On February 5 and 6, 2018, the VIX increased abruptly, and in a manner that plaintiffs allege was the product of manipulation. In the middle of the morning on February 5, 2018, the S&P 500 began to fall and the VIX rose "in an orderly manner." [144] (LJM) ¶¶ 88–89. Sometime around 1:20 p.m. the VIX began to increase rapidly and by 1:57 p.m., the VIX had increased 61.6% from its opening position. *Id.* ¶ 90. At the close of trading on February 5, 2018, the VIX had increased 116%, which

represented the largest daily move in the history of the VIX. *Id*. ¶¶ 14–15; *see also* Figure 1.

Plaintiffs had a trading strategy of selling options on S&P 500 Futures that were out-of-the money; they made money on the premiums and were betting that the market would have a low degree of volatility. [144] (LJM) ¶ 19, Appx. ¶¶ 2–5; [152] (Two Roads) ¶ 19, Appx. ¶¶ 2–5. As the S&P 500 fell, plaintiffs responded by "rolling" their position—buying puts that were closer to the then-prevailing S&P 500 price and selling puts that were farther away from the price—as well as taking other actions to mitigate their risk in changing market conditions. [144] (LJM) ¶ 88. Plaintiffs remained in a net short put position. *Id*. When the VIX rose precipitously at around 1:20 p.m., however, the premium price of out-of-the-money options on S&P 500 Futures increased. *Id*. ¶ 91. This made the plaintiffs' adjustment trades more expensive. *Id*. By 2:00 p.m., plaintiffs' "ability to obtain meaningful bids and quotes for options on the S&P 500 Futures market had completely evaporated … The spread between the bid and ask quotes for SPX Options and the directly correlated options on S&P 500 Future had … increased dramatically." *Id*. ¶ 93; [152] (Two Roads) ¶ 93. These trades resulted in a loss of approximately $334.9 million for LJM and $430 million for Two Roads by the close of trading on February 5, 2018. [144] (LJM) ¶ 95 *and* [152] (Two Roads) ¶ 95. Plaintiffs allege that the prices of the options on S&P 500 Futures were artificially high and the product of defendants' manipulation. *Id*.

Things went from bad to worse for LJM and Two Roads. Because of instability in the VIX and the losses LJM and Two Roads had incurred during trading hours,

their futures clearing merchant, Wells Fargo, required plaintiffs to post a margin call of millions of dollars to their account with Wells Fargo, by the opening bell of February 6, 2018. [144] (LJM) ¶¶ 96–97; [152] (Two Roads) ¶¶ 96–97. When plaintiffs could not satisfy the large margin call, Wells Fargo required them to close the positions they held in their Wells Fargo account. [144] (LJM) ¶ 98; [152] (Two Roads) ¶ 98. Before trading opened on February 6, 2018, plaintiffs short-sold E-minis to offset their options positions and closed out their remaining short put positions on options of S&P 500 Futures by buying back the same options at inflated prices. [144] (LJM) ¶ 99; [152] (Two Roads) ¶ 99.

Plaintiffs allege that markets for SPX Options, options on S&P 500 Futures and E-minis were "illiquid and artificially inflated because of Defendants' manipulation, which continued into the morning of February 6, 2018 … As a result, [plaintiffs'] transactions in options on S&P 500 Futures and E-minis on February 6, 2018, were executed at extremely adverse prices" resulting in a total loss of $446.8 million for LJM and approximately $610 million for Two Roads. [144] (LJM) ¶¶ 100–102; [152] (Two Roads) ¶¶ 100–102. The losses were "catastrophic" for LJM and Two Roads; LJM liquidated its funds and accounts. [144] (LJM) ¶ 104. Two Roads liquidated the Preservation Fund. [152] (Two Roads) ¶ 104.

### E. Plaintiffs' Analysis of Defendants' Quotes

Plaintiffs reviewed Cboe's record of quotes, quote updates, and quote cancellation messages made by market-makers for the SPX Options eligible for inclusion in the spot VIX on February 5 and 6, 2018. [144] (LJM) ¶ 111. Plaintiffs

sorted this data using parameters which they allege indicate that the selected quotes were not made for a legitimate purpose. *Id.* ¶¶ 114, 126, 135. From that set of illegitimately motivated quotes, plaintiffs concluded that the defendants made most of the "manipulative" quotes during the relevant time periods of February 5 and 6, 2018. *Id.* ¶¶ 115, 120–22, 137, 143, Tables 7, 8, 9, 10, 14, and 15.

### 1. *Midpoint Flashes*

Plaintiffs created a set of the best bids and best offers (called "top-of-book" bid and ask quotes) for each put and call strike price. [144] (LJM) ¶ 113. Plaintiffs then identified periods of time when the midpoint of top-of-book quotes on a strike price increased by 25% or more, before returning to within 12.5% of the original midpoint within a minute, alleging that kind of increase and drop in price was indicative of manipulation rather than a good faith attempt to trade at a new price level. *Id.* ¶ 114. Plaintiffs refer to the quotes that raised the midpoint in this way as "midpoint flashes" and allege that the quotes were, on average, live for less than 0.5 seconds *Id.* ¶¶ 112–116. Plaintiffs then identified firms that placed these midpoint flashes and found that the defendants were responsible for over 90% of the midpoint flashes on February 5 and 6, 2018. *Id.* ¶ 115; Tables 3 and 4.

There are three characteristics of the midpoint flashes that suggest to plaintiffs that the quotes were intended to, and did, affect the VIX and implied volatility. First, plaintiffs found that defendants made midpoint flashes at similar times to when the VIX increased. [144] (LJM) ¶ 117; *compare* Figure 1 *with* Table 5 *and* Figure 2 *with* Table 6. For example, on February 5, 2018, from noon to one p.m.,

defendants placed 5,752 midpoint flashes. *See id.* Table 5. From one p.m. to two p.m., however, as the VIX increased substantially, the defendants placed 29,006 midpoint flashes. *Id.* The volume of midpoint flashes continued to be high until the close of trading on February 5, 2018, and through the morning of February 6, 2018. *See id.* Tables 5 and 6.

Second, plaintiffs allege that the defendants' midpoint flashes were placed on SPX Option strike prices that would have been eligible for inclusion in the VIX calculation because the strike prices were neither zero-bid themselves nor after two zero-bid strike prices. [114] (LJM) ¶ 118, Tables 3a, 4a. Third, based on their analysis of the quote data and work to re-create the VIX from the relevant days, plaintiffs believe that the VIX is calculated using a snapshot of bid-ask quotes within the five second period before the VIX is calculated. *Id.* ¶¶ 119–120 n.41. Plaintiffs say that defendants made 91% of midpoint flashes within five seconds of a VIX publication on February 5. *Id.* ¶ 122; Table 9. Defendants were responsible for 88% of midpoint flashes of bid quotes and 91% of ask quotes within five seconds of a VIX publication on February 6, 2018. *Id.* ¶ 122, Table 10.

In order to determine which midpoint flashes were potentially included in the VIX on February 5 and 6, 2018, plaintiffs re-created the spot VIX calculations and determined which midpoint flashes were potentially included in them. [144] (LJM) ¶ 119. Their recreation indicated that defendants were responsible for 89% of the midpoint flashes that were potentially included in the spot VIX. *Id.* ¶ 120, Table 7. Furthermore, defendants were responsible for 96% of the bid quotes and 85% of the

14

ask quotes that were flashed, potentially included in the spot VIX, and resulted in a new VIX value. *Id*. ¶ 121, Table 8.

### 2. Extending Chain of Options

Plaintiffs also allege that defendants manipulated the VIX by "flashing" quotes on SPX Option strike prices that were otherwise zero-bid, thereby extending the chain of SPX Option strike prices that are included in the VIX calculation. [144] (LJM) ¶ 124. "Extending the chain results in the inclusion of further out-of-the money options into the VIX calculation … [which] have greater implied volatility and a higher impact on the VIX." *Id*.

Plaintiffs used their recreation of the spot VIX to identify when the number of option strikes included in the calculation increased by 10% or more above its five-minute average; plaintiffs allege that such increases could only occur if market makers placed quotes on previously zero-bid strike prices. [144] (LJM) ¶ 126. Plaintiffs then matched the instances when the option chain lengthened by a significant amount to the times when the VIX increased. *Id*. ¶ 127. Of the 30,000 bid and ask quotes placed during those periods of times, plaintiffs focused on bid quotes placed on strike prices that were previously zero-bid; defendants were responsible for over 99% of those bid quotes. *Id*. ¶¶ 129–30, Table 12. Most of those bid quotes were made between 1:55 p.m. and 3:15 p.m. on February 5, 2018, and 8:45 a.m. and 11:00 a.m. on February 6, 2018, when the VIX rose precipitously. *Id*. ¶ 131.

Finally, plaintiffs identified quotes on other zero-bid strike prices that were five cents or higher and withdrawn within less than one second; plaintiffs called these

"zero-bid flashes." [144] (LJM) ¶ 135. Plaintiffs allege that the short duration of the flash indicated "a lack of good faith intent to trade, an intent to manipulate and create artificial prices both by the placement of the quote itself and by inducing other market participants to react to the flashed quote." *Id.* Plaintiffs found zero-bid flashes were made with greater frequency between 12:00 p.m. and 3:15 p.m. on February 5, 2018, and defendants were responsible for about 85% of those zero-bid flashes. *Id.* ¶¶ 136–37, Table 14. Plaintiffs observed a consistent pattern of zero-bid flashes every 4 to 15 seconds during the afternoon of February 5. *Id.* ¶ 139. Zero-bid flashes were also concentrated in the early morning of February 6, 2018, and defendants were responsible for 99% of them. *Id.* ¶ 143, Table 15.

Plaintiffs also compared the change in the VIX on February 5 and 6, 2018, to the change in the VIX on other days when the S&P fell by a similar amount and found that the VIX changed more on February 5 and 6 than on the comparable days. [144] (LJM) ¶¶ 153–162, Tables 19 and 20. Furthermore, the plaintiffs calculated that "the 116% increase in the VIX on February 5, 2018, equates to 13.7 standard deviations from the mean settlement price during the 12 months preceding February 5, 2018. A deviation of this magnitude is statistically impossible to explain as a result of rational fair market activity." *Id.* ¶ 159. The VIX did not change to this degree during the 2008 global financial crisis, even on days when the S&P 500 fell by 7.6% or greater, as compared to the 4.10% fall on February 5, 2018. *Id.* ¶ 160.

16

Finally, plaintiffs allege that defendants held long volatility positions and that as the implied volatility rose on February 5 and 6, 2018, defendants benefitted. [144] (LJM) ¶¶ 20, 105–110.

## F.    Procedural History

LJM filed its complaint in January 2019, just shy of a year after the February 5, 2018 market downturn. [1] (LJM). Its first complaint named "John Does" as firms that engaged in manipulation by "placing artificial and manipulative bid-ask quotes on out-of-the money SPX Options" to manipulate the VIX on February 5 and 6, 2018. [1] (LJM) ¶¶ 19, 26–27. LJM alleged that this manipulation of the price of SPX Options also created artificial prices in S&P 500 derivatives, in violation of the Commodity Exchange Act. *Id.* ¶ 28. LJM brought a motion to expedite discovery, specifically to obtain quote and trade data for SPX Options from Cboe so that it could identify the Doe defendants; that motion was denied without prejudice. [7], [18] (LJM). At the time that LJM filed its complaint, a multi-district litigation action was pending in this district regarding manipulation of the VIX. *See In re: Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, No. 18-cv-04171 (VIX MDL). The two matters were deemed related, and discovery was ordered coordinated and stayed. [21] (LJM).

LJM filed a second motion to expedite discovery, again asking to serve a subpoena to Cboe for quote and trade data to identify the Doe defendants. [23] (LJM). I denied that motion in August 2019 because LJM was requesting "extensive merits discovery." [30] (LJM) at 1. Allowing an individual plaintiff to pursue third-party

discovery would be contrary to the objective of multi-district litigation—coordination between multiple, related cases so they can be adjudicated fairly and efficiently. *Id*. at 1–2.

Two Roads filed its complaint on February 4, 2020. [1] (Two Roads). On February 20, 2020, both plaintiffs filed a motion to expedite discovery for quote data to identify Does and I granted the motion in April 2020. [294], [311] (VIX MDL). After litigating a motion to quash, plaintiffs received the first set of data from Cboe in July 2020. [185] at 17 (LJM). Plaintiffs analyzed the data and in November 2020 asked Cboe to unmask the firms whose quotes plaintiffs believed were manipulative. *Id*. In response, Cboe told plaintiffs that the algorithm it used to create the aliases for the market-makers had errors, so it had to send a new data set. *Id*. Throughout the winter of 2020 and spring of 2021, plaintiffs sent informal requests to Cboe to unmask five firms and corresponded about unmasking with Cboe and counsel for Doe defendants. [38] (LJM) at 1–2; [40] (LJM) at 1–2; [42] (LJM) at 1–2.

On May 17, 2021, plaintiffs filed a motion to compel Cboe to identify five firms from the quote data. [52] (LJM) at 1. The motion was denied on the basis that plaintiffs' motion described a different theory of liability than alleged in their complaints, but plaintiffs were quickly granted leave to file amended complaints. [75] (LJM) at 6:1–7:14; [78] (LJM).

In November 2021, plaintiffs filed their amended complaints against "John Does"; plaintiffs alleged that nine anonymous firms (firms 4, 5, 8, 9, 12, 13, 14, 16, and 17 from Cboe's data set) engaged in manipulation of SPX Options to create an

18

increase in implied volatility and the VIX, causing artificial prices of options on S&P 500 futures and E-minis. [83] (LJM) ¶¶ 1, 16. Plaintiffs then filed a second motion to compel Cboe to identify the Doe defendants; the motion was granted on August 16, 2022, and plaintiffs filed a sealed Second Amended Complaint naming defendants on August 30, 2022. [96], [129], [134] (LJM). A Third Amended Complaint was filed on September 28, 2022. [139], [144] (LJM).[3] Defendants move to dismiss.

## III. Analysis

### A. LJM's Article III Standing

Defendants argue that LJM has not alleged that it suffered an injury-in-fact because LJM's customers suffered the losses, not LJM itself. [173] (LJM) at 27–29. An investment firm does not have standing to bring a Commodity Exchange Act claim for losses to customer accounts. *Indemnified Cap. Invs., SA v. RJ O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1409 (7th Cir. 1993) ("Based on the record before us, [defendant] only had authorization to trade in the customer accounts and thus any losses are only attributable to ICI's customers. Accordingly, ICI has failed to satisfy the injury in fact element of standing."); *see also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 110–11 (2d Cir. 2008) (investment advisor does not have Article III standing to bring Securities Exchange Act claim over losses suffered by his clients; *In re Bard Assocs. Inc.*, No. 09-6243, 2009 WL 4350780, at *2 (10th Cir. Dec.

---

[3] The August 30, 2022 Second Amended complaint did not name IMC-Chicago (Firm 13). [133], [140] (LJM). Plaintiff filed motions for extension of time to name Firm 13, which were granted. [130], [141] (LJM). IMC-Chicago was named in the Third Amended Complaint filed on September 28, 2022. [144] (LJM). Plaintiffs voluntarily dismissed claims against Firm 4 in July 2022. [127] (LJM).

2, 2009). LJM argues that it adequately alleged injury because defendant's manipulation caused losses that left "LJM with no other choice than to liquidate its funds and accounts." [144] (LJM) ¶ 104. But LJM has not alleged whether that liquidation was at a loss to LJM itself. Furthermore, it's not clear whose money was in LJM's funds and accounts.

LJM alleges that it "was a Commodity Trading Advisor and Commodity Pool Operator that managed a total of approximately 50 accounts … on behalf of investors"; among those accounts were "limited partnership funds for which LJM served as general partner." [144] (LJM) ¶ 1 n.2. That allegation does not make it clear whose money was in the accounts used to purchase the financial instruments at artificially high prices, i.e., who suffered the loss caused by defendants' manipulation. The plaintiff in *ICI* "maintain[ed] customer accounts for investment purpose" and also had "house accounts which belonged to ICI and not to its respective customers." *ICI*, 12 F.3d at 1407. ICI had no Article III standing as to the customer accounts because "the losses incurred by the ICI customer accounts accrued only to ICI's customers … [and] ICI has not alleged in its complaint that it owned the funds in its customer accounts []." *ICI*, 12 F.3d at 1409. LJM has not alleged facts to support the inference that it owned the money in the accounts it managed and therefore has not alleged that it has standing to bring claims based on losses to those accounts.

In response, LJM argues that because it was the general partner of funds that were liquidated, "LJM was injured and has standing to sue, as injury to the limited partnership fund damaged the partners within the fund, including LJM as general

partner." [185] (LJM) at 21. But LJM's complaint does not identify how liquidation of the funds injured it, and even drawing inferences in LJM's favor there is a step (or more) between trading losses and a general partner's suffering a concrete injury giving rise to its own standing. The complaint does not fill that gap.

LJM also argues that as general partner it can sue on behalf of the partnership funds and that its complaint did just that. [185] (LJM) at 21. Under Illinois law "a partnership may sue or be sued in the names of partners *as individuals doing business as the partnership*, or in the firm name, or both." 735 ILCS 5/2-411(a). LJM did not bring this suit as "LJM Partners, Ltd, as general partner of XYZ fund." Nor did it bring the suit as "LJM Partners, LTD, *doing business as* XYZ partnership." *See McSpadden v. Marozas*, No. 96 C 6981, 1998 WL 142452, at *3 (N.D. Ill. Mar. 23, 1998) (plaintiff lacked standing because property at issue was titled to partnership and plaintiff brought suit individually). The complaint does not reflect that LJM is bringing its claim as the general partner of any partnership.

Finally, LJM argues that the true concern is identifying the real parties in interest, i.e., the investors, and Federal Rule of Civil Procedure 17 requires the court to grant it a reasonable time for the real parties in interest to join the action. [185] (LJM) at 22. But that procedure is only available to a plaintiff who has Article III standing, it does not answer the question of whether LJM itself can bring an action. *See Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 385 (7th Cir. 2020) ("An uninjured plaintiff suing on behalf of another is normally required to identify one of these existing doctrines—most of which have deep common-law roots and all of which

21

are limited in scope to ensure that the dispute is actually an Article III "case" or "controversy"—to establish representative standing.").

It is not clear from LJM's complaint who owned the options and futures contracts that were traded at manipulated prices. Nor is it clear that LJM *itself* had to go out of business or how LJM *itself* was injured as a result of the manipulated prices. LJM has not alleged that it suffered an injury-in-fact to provide it with Article III standing and its complaint is dismissed without prejudice. *See White v. Illinois State Police*, 15 F.4th 801, 808 (7th Cir. 2021).

## B.    Statute of Limitations

The statute of limitations for claims under the Commodity Exchange Act is two years. 7 U.S.C. § 25(c). This period starts "when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991). Two Roads filed its complaint within two years of February 6, 2018, but the complaint only named "John Does" as defendants. When the initial complaint only names Doe defendants, amended complaints that actually name the defendants do not relate back to the date of the first complaint. *Herrera v. Cleveland*, 8 F.4th 493, 498 (7th Cir. 2021). Because the Second Amended Complaint that named defendants was filed in August 2022, defendants argue that plaintiff's claims are barred by the statute of limitations. [180] (Two Roads) at 29. Dismissal of a complaint on statute of limitations grounds "is appropriate only where the allegations of the complaint itself set forth

everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Laby's, Inc.*, 782 F.3d 922, 928 (7th Cir 2015).

Two Roads does not dispute that it knew of its injury on February 6, 2018, and instead argues that the statute of limitations is triggered only when the would-be plaintiff learns the identity of the person who wronged it, in this case when Cboe unmasked the defendants' identities pursuant to court order in August 2022. [192] (Two Roads) at 24, 26. *See Prime Eagle Group, Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 377 (7th Cir. 2010) ("Normally knowledge of who injured you is essential, in addition to knowledge of the injury's existence."); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010) (The statute of limitations "starts running when the prospective plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to his claims and the injurer or (in this case) injurers."). But those references to "who injured you" or "injurer" do not require knowing *the name* of the injurer. And, in any event, "discovery of the injury, not discovery of the other elements of a claim is what starts the clock." *Sidney Hillman*, 782 F.3d at 926 (citing *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). The Supreme Court has not adopted the rule that accrual begins when a plaintiff discovers both his injury and *who* caused it, and the Seventh Circuit "has never overruled decisions … adopting a simple injury discovery rule." *Sidney Hillman*, 782 F.3d at 930.[4]

---

[4] Two Roads also argues that there is an insurmountable tension between requiring allegations of the "who, what, when, where, and how" and starting the clock on a statute of limitations when the prospective plaintiff does not know the "who." [192] (Two Roads) at 27 n.9. I disagree. A plaintiff can meet their Rule 9(b) requirements by naming "Firm 1" or "John Doe 1" and using the "what, when, where, and how" of the alleged fraud to further describe

Plaintiff cites to *In re Copper Antitrust Litigation* to argue that accrual of a claim is an issue ill-disposed to resolution at the motion to dismiss stage. *See* [192] (Two Roads) at 25. In that case, there was a contested question of fact about when plaintiffs should have known that J.P. Morgan was involved in the scheme. *See id.*, 436 F.3d 782, 789–90 (7th Cir. 2006). Here, there is no dispute of facts that might change when plaintiff's claims accrued.[5] Two Roads's hurdle was that it could not find out the names of the defendant entities until it completed Doe discovery and that is not an issue that implicates the accrual of their claim. Plaintiff argues in the alternative it is entitled to equitable tolling of the statute of limitations for the period of time it was conducting the Doe discovery.

A plaintiff "has the limitation period to discover [who injured him], draft his complaint, and file suit. If despite the exercise of reasonable diligence, he cannot discover his injurer's (or injurers') identity within the statutory period, he can appeal to the doctrine of equitable tolling to postpone the deadline for suing until he can obtain the necessary information." *Sidney Hillman*, 782 F.3d at 930 (citing *Fid. Nat'l Title Ins. Co. of New York v. Howard Sav. Bank*, 436 F.3d 836, 839 (7th Cir. 2006)).

---

the injurer (for example, John Doe who placed four quotes on XYZ financial instrument between 10 and 11 a.m. on May 7, 2023).

[5] Because discovery of the name of the defendant is not necessary to trigger the statute of limitations, it does not matter to the question of accrual that plaintiffs had to use the legal process to find out the names of their defendants. *Cf. Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997) (pre-*Merck* securities case on statute of limitations in which the court found plaintiffs could not have known of defendant's untrue statements until separate lawsuit revealed them and rejected defendants' argument that plaintiffs could have hired attorneys to discover untrue statements).

Equitable tolling allows a plaintiff to pause the running of the statute of limitations "when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Xanthopoulos v. United States Dep't of Labor*, 991 F.3d 823, 831 (7th Cir. 2021). Equitable tolling can be used when the plaintiff was unable to discover the name of a defendant and filed suit against a John Doe. *Herrera*, 8 F.4th at 499; *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (Equitable tolling allowed where plaintiff filed a "defective pleading during the statutory period."). The burden is on the plaintiff to show that it was diligent in pursuing the claim and that an extraordinary circumstance, beyond its control, prevented it from being able to file a timely complaint. *Menominee Indian Tribe of Wisconsin v. U.S.*, 577 U.S. 250, 255–57 (2016). The question of whether to apply equitable tolling is generally fact dependent, *Socha v. Pollard*, 621 F.3d 667, 672 (7th Cir. 2010), but here all of the relevant facts are part of the judicially noticeable procedural history.

Two Roads identifies four events, or periods of time, during which it argues the statute of limitations should be tolled—time spent obtaining Doe discovery, briefing the motion to quash, time spent with an erroneous data set, and briefing the motions to unmask. [192] (Two Roads) at 29.

As an initial matter, the fact that defendants were anonymous is not an extraordinary circumstance. The anonymous market is not new, and the sophisticated participants who benefit from anonymity should be expected to incorporate that market feature into their pre-suit investigation of accrued claims. It

is an accepted practice to sue with placeholder defendants and use discovery to learn and substitute names. *See Rodriguez v. McCloughen*, 49 F.4th 1120, 1121 (7th Cir. 2022) (noting that "a plaintiff who uses placeholders must take account of the clock.")

Two Roads argues that the stay on discovery due to the pending VIX multi-district litigation action was a circumstance outside of its control that rendered it unable to conduct Doe discovery until April 21, 2020. [192] (Two Roads) at 28–29. But Two Roads was not diligent in filing its suit in the first place; it waited until two days before the statute of limitations ran. Two Roads says it was pointless to file its own complaint when LJM's case was subject to the stay in the MDL. [192] (Two Roads) at 31. If Two Roads had filed its own complaint and pursued Doe discovery on its own, it may have fared differently. Indeed, I granted the motion for expedited for discovery that was filed right after Two Roads joined the case and which proposed a novel way to conduct Doe discovery. *See* [294], [311] (VIX MDL). Although the parties were not in control of my management of the discovery stay in the MDL, they do not explain why they could not have offered their more tailored and successful motion for discovery sooner.[6]

---

[6] Although certainly more diligent than Two Roads in filing its complaint, LJM likewise would not be able to benefit from equitable tolling of the time that the parties spent obtaining Doe discovery. LJM's attorneys were active in the VIX MDL from the outset and knew that there would be a fight to obtain the names of the firms that served as market makers for SPX Options. *See Tomasulo v. CBOE Exchange, Inc. et al*, No. 18-cv-02025 (complaint filed March 20, 2018, and transferred to MDL on June 26, 2018). LJM's first motion for expedited discovery was denied for being overbroad and LJM did not change its request on its second motion. *See* [7], [18], [23], [30] (LJM). LJM is a sophisticated actor with sophisticated counsel who had specific knowledge about the possible claims arising out of the VIX's behavior on February 5 and 6, 2018, as well as the hurdles to obtaining relief on those claims. This is not the kind of extraordinary circumstance that gives rise to equitable tolling. Because an

Two Roads also argues that the time spent briefing the motion to quash its subpoena to Cboe should be tolled. [192] (Two Roads) at 29. But that is the kind of ordinary delay inherent to litigation and does not pose an extraordinary circumstance. *See Carpenter v. Douma*, 840 F.3d 867, 872–73 (7th Cir. 2016). The same is true for the time it took to brief the motion to unmask defendants, which took two rounds of briefing from May 17, 2021 to August 16, 2022. *See* [49], [71], [95], [136] (Two Roads). Some of the delay was due to the fact that plaintiff's first motion to unmask articulated a theory of the case that differed from the theory in its complaint. *See* [71], [72] (Two Roads) at 6:5–7 ("The behavior of the market participants as described in the present motion is different than the conduct alleged in the complaints."). The initial denial of the motion is not a reflection on plaintiff's diligence, but rather a reality of litigation—sometimes legal arguments are not accepted by the court and a party must adjust. But if Two Roads had been more diligent in filing its complaint in the first place, it would have had more time for that adjustment.[7]

The circumstance that is most extraordinary and out of Two Roads's control was the delay caused by Cboe sending erroneous data and which required Cboe to re-

---

amended complaint from LJM would be filed past the statute of limitations, I do not grant it leave to re-plead.

[7] Plaintiff argues that even if it had filed its complaint on the first possible day, February 7, 2018, the process to obtain Doe discovery took so long that its complaint would be untimely. [192] (Two Roads) at 30. That is a counterfactual that I do not find convincing. As discussed below, perhaps if Two Roads had filed their complaint earlier, then the balance of equities would be different.

send the data set and plaintiff to re-analyze the data. But the record reflects that it took Two Roads only about two months to re-analyze the data. *See* [192] (Two Roads) at 17 (Cboe tells plaintiff it identified errors in the data on November 17, 2020) *and* [28] (Two Roads) at 2 (plaintiff sends revised unmasking request on January 8, 2021). Those two months do not change the timeliness of Two Roads's complaint; equitable tolling only pauses the clock for the period of time in which the "tolling event" takes place. *See Prime Eagle Group*, 614 F.3d at 379 ("Equitable tolling does not *restart* the period of limitations … Instead it permits deferral of suit until the tolling event ceases and requires diligent action thereafter.").

Ultimately, I must look at "all of the circumstances [faced by the plaintiff] and consider the cumulative effect of those circumstances to determine whether they were extraordinary and truly prevented timely filing." *Carpenter*, 840 F.3d at 872. Putting all of the facts together, Two Roads did not exercise the kind of diligence to merit the exceptional relief of equitable tolling. If Two Roads had filed its complaint as soon as it knew it was injured, then perhaps the sum of the delays in conducting Doe discovery would weigh more heavily in favor of equitable relief. But when Two Roads waited until two days before the statute of limitations expired just because its compatriot (who Two Roads might have anticipated would have an Article III standing problem) was unsuccessful in obtaining Doe discovery, it did not exercise the kind of diligence necessary to receive equitable tolling.

### C.    Failure to State a Claim

The parties have briefed the merits of Two Roads's claims against defendants, and in the interest of completeness I address whether Two Roads has stated a claim.

####    1.    *Price Manipulation*

A plaintiff states a claim for price manipulation in violation of 7 U.S.C. §§ 6c, 13(a) and 17 C.F.R. § 180.2 when it plausibly alleges that the (a) defendant possessed the ability to influence prices, (b) an artificial price existed, (c) defendant caused the artificial price, and (d) defendant specifically intended to cause the artificial price. *In re Dairy Farmers of Am., Inc. Cheese Litig.*, 801 F.3d 758, 764–65 (7th Cir. 2015). To adequately allege a specific intent to manipulate a price, a plaintiff must allege facts that give rise to a plausible inference that defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Kraft Foods*, 153 F.Supp.3d at 1020 (quoting *CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523, 532 (S.D.N.Y. 2008)).

The CEA's private right of action makes actionable "a manipulation of any such contract … or the price of the commodity underlying such contract" where "such contract" refers to "any contract of sale of any commodity for future delivery (or option on any such contract or any commodity)." *See* 7 U.S.C. § 25(a)(1)(D)(ii) *and* (B). Thus, a plaintiff must allege that defendant specifically intended to manipulate the price of the financial instrument (or commodity underlying that instrument) in which the plaintiff traded. *See In re Dairy Farmers*, 801 F.3d at 764. The court in *Dairy Farmers*

relied on *Hershey v. Energy Transfer Partners, L.P.*, which held that alleging that defendants knew their actions would have secondary effects on prices of other commodities or financial instruments was insufficient to plead the specific intent required for a CEA price-manipulation claim. *Id.*, 610 F.3d 239, 249 (5th Cir. 2010). I agree.

Two Roads alleges that the prices of the relevant financial instruments move in tandem, *see* [152] (Two Roads) ¶¶ 58–63, and the "interrelated nature [of the instruments] ensured that Defendants' manipulative quotes directly impacted the price and value of options on S&P 500 Futures and E-minis as well." *Id.* ¶ 64. But there is no allegation that defendants, by making manipulative quotes on SPX Options, *intended to* create artificial prices in options on S&P 500 Futures, E-minis or S&P 500 Futures. Plaintiff argues specific intent is a question of fact inappropriate for resolution at the pleading stage and that they have alleged that defendants understood that the price of SPX Options "moved in tandem" with the prices of the other financial instruments. [192] (Two Roads) at 42. Taking plaintiff's allegations as true, I accept that defendants knew that manipulating the price of SPX Options and the VIX would cause artificial prices of Options on S&P 500 Futures, E-minis, and S&P Futures. But that is still not an assertion that defendants intended to cause those artificial prices because knowledge of an effect, without more, is not the same thing as a specific intent to create that effect. *See Hershey*, 610 F.3d at 249. Two Roads does not state a price-manipulation claim.

2. *Manipulative Device*

When a CEA manipulative-device claim is based on a manipulative act or scheme rather than an overt misrepresentation, a plaintiff meets its Rule 9(b) pleading requirements by alleging (a) what manipulative acts were performed, (b) which defendants performed them, (c) when the manipulative acts were performed, and (d) what effect the scheme had on the market for the commodities at issue; plaintiff must also allege that defendants intentionally or recklessly engaged in the manipulation. *See Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, 596 F.Supp.3d 1076, 1097–98 (N.D. Ill. 2022). Intentional or reckless conduct can be alleged through "facts showing an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1098.[8] Because Section 22 of the CEA (which provides the private right of action) gives relief only for actual damages, a plaintiff must plead "actual injury caused by the violation." *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104, 111 (2d Cir. 2018).

Defendants attack plaintiff's pleading on two fronts—intent and causation.

a. *Intent*

Plaintiff has adequately alleged intent for a CEA manipulative-device claim, which requires either an intentional or reckless *mens rea*. Plaintiff alleges that

---

[8] The Private Securities Litigation Reform Act sets out higher standards for alleging scienter in "any private action arising under this chapter." 15 U.S.C. § 78u-4(b)(2). Because plaintiff's claims don't arise from Chapter 2b – Securities Exchanges, I do not apply the higher scienter standard. *See also Ploss*, 197 F.Supp.3d at 1053 (because of differences in securities and derivatives, CFTC is "guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5.11.").

defendants "flashed" quotes for SPX Options that were of a short duration, withdrawn quickly, that raised the midpoint price of strikes that would have been included in the VIX (or for quotes meant to extend the chain of options included in the calculation, on previously zero-bid out-of-the-money strike prices), and that were made at the times that the VIX was sharply increasing. [152] (Two Roads) ¶¶ 111, 113–118, 126–131, 135–137, 139–145. Plaintiff alleges these characteristics describe quotes placed in order to manipulate the price of SPX Options and the VIX. *Id.* ¶¶ 114, 135, 141–42. There are other explanations for these characteristics. Defendants point to the fact that they were market makers "fulfilling their obligation to make a 'continuous' market and to update quotes to reflect changed market conditions." [194] (Two Roads) at 18. But at this point in the litigation, I draw all inferences in favor of the plaintiff, and it has alleged enough to suggest the requisite intent.

Plaintiff does not need to meet the PSLRA's heightened requirement that its allegations lead to a strong inference of scienter, so defendants' arguments about the plausibility of their motive are not persuasive. Morgan Stanley submitted a separate brief arguing that because it is subject to the Volcker Rule's prohibition on proprietary trading it had no motive to cheat the marketplace because it could not enrich itself through trading. [183] (Two Roads) at 3–4. I appreciate the argument, but there are other ways that Morgan Stanley could have benefitted from the alleged manipulation—higher returns for their clients could result in more business or larger fees. Factual allegations about a defendant's motive for any particular behavior can be helpful in determining the plausibility of an allegation of manipulative intent, but

it is not necessary at this stage for plaintiff to allege that defendants had a specific motive for their behavior.[9] Instead, the plaintiff must adequately allege that the defendant acted intentionally or recklessly. *See Mish*, 596 F.Supp.3d at 1098. Here, I find the specific details about the quotes that defendants made are sufficient to suggest a plausible inference that defendants' quotes were not intended to create markets or trade, but rather intended to affect prices of SPX Options and the VIX.

        b.   *Causation*

A plaintiff must allege facts about "what effect the scheme had on the market for the commodities at issue," *Ploss*, 197 F.Supp.3d at 1056–57, and must also allege that defendants' manipulation caused them actual injury. *Total Gas*, 889 F.3d at 111. Causation poses two questions—(a) did defendants' actions affect the instrument or market in which plaintiff traded? and (b) was that effect to the plaintiff's detriment? *See Total Gas*, 889 F.3d at 112 (discussing causation standard for CEA manipulation claims generally).

Defendants argue that plaintiff has failed to plausibly allege that defendants (together or individually) influenced the VIX on February 5 and 6, 2018, and that

---

[9] Both Morgan Stanley and the joint defendants' brief cite to *In re Cboe VIX Manipulation Antitrust Litigation* for the standard to plead intent under the CEA. *See* [183] (Two Roads) at 5 *and* [180] (Two Roads) at 37. But the part of the *VIX* decision cited discusses Securities Exchange Act claims, which are subject to the PSLRA, and have a heightened pleading standard. *See In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F.Supp.3d 845, 860–61 (N.D. Ill. 2020) ("The PSLRA requires plaintiffs to state with particularity … the defendant's intention to deceive, manipulate, or defraud … A plaintiff may plead scienter by either presenting strong circumstantial evidence of conscious misbehavior or recklessness, or by showing that the defendants had both the motive and opportunity to commit fraud."). Because I do not find that the PLSRA applies to CEA claims, I do not hold plaintiff to a requirement to plead motive and opportunity.

plaintiff can't state a claim for manipulation of options on S&P 500 Futures and E-minis via manipulation of SPX Options because there is no formal rule-based linkage between the instruments. [180] (Two Roads) at 47–48, 52–53.

Two Roads alleges that that the manipulative quotes were made at the same times during which the VIX was increasing. *See* [152] (Two Roads) ¶¶ 117, 131, 136–37, 143–44; *compare* Tables 5, 6, 14, 15 *with* Figures 1, 2. Plaintiff also alleges that the VIX was anomalously high when compared to other days when the S&P 500 fell by comparable levels. *Id.* ¶¶ 152–155. The complaint alleges that the February 5, 2018 increase in the VIX was 13.7 standard deviations from the mean settlement price during the prior twelve months and that kind of deviation is "statistically impossible to explain as a result of rational fair market activity." *Id.* ¶¶156–59. Two Roads alleges that "going back to 2004, prior to February 5, 2018, the VIX *never* exceeded a 2.91 standard deviation change in one day from its previous 12-month mean settlement price." *Id.* ¶ 160. These allegations raise a plausible inference that something was going on with the VIX aside from a response to the S&P 500 decreasing. Putting that together with the allegations that defendants were making quotes at the same times the VIX was behaving in an unexpected manner and in a way likely to influence the VIX, plaintiff has met its burden of plausibly pleading that defendants' actions affected the VIX.

Defendants respond by emphasizing the *de minimis* number of quotes that plaintiff identifies as having affected the VIX and argue that makes it implausible that defendants actually impacted the VIX. But according to the allegations in Two

Roads's complaint, the number of quotes is not as important as whether the quotes were actually incorporated into the VIX. *See* [152] (Two Roads) ¶¶ 71, 75–79 (describing how quotes are filtered in the VIX calculation process and how quotes that increase the midpoint for included strikes or quotes that extend the chain of strike prices included in the VIX calculation can affect the output of the calculation). The time that the VIX is calculated, and thus the snapshot of strike prices (and associated midpoints) incorporated into the calculation is unknown. *Id.* ¶ 66. Therefore *proving* that defendants' quotes actually made an impact on the VIX would require discovery. But Two Roads has alleged that the VIX calculation is not based solely on the volume of quotes made, but rather whether the quotes meet particular characteristics and happen to be extant at the time the VIX snapshot is taken. *See id.* ¶¶ 71, 75, 76. Plaintiff has alleged that defendants' quotes met those characteristics, *id.* ¶¶ 113, 118, 120, 127–28, and that the quotes were made at the same times the VIX was increasing. *Id.* ¶¶ 117, 131, 136–37, 143–44; *compare* Tables 5, 6, 14, 15 with Figures 1, 2.[10] Defendants do not offer support for their assertion that only a large number of volume of quotes would affect the VIX. In order to prevail, plaintiff would have to prove that defendants' manipulative quotes actually affected

---

[10] Defendants make a lot out of the fact that for some of the allegedly manipulative quotes, plaintiff only alleges that the quotes were "potentially included" in the VIX. [180] (Two Roads) at 26, 44 n.27; *see* [152] (Two Roads) Tables 7, 8. But no one, except for Cboe presumably, knows whether the quotes were included in the VIX. Plaintiff has a theory about which quotes were used to calculate the VIX and its pleading reflects that; without discovery plaintiff could not know for certain that the quotes were included, but that doesn't preclude it from alleging a plausible theory.

35

the VIX. But at this stage, Two Roads has met its burden to plead facts that plausibly relate how defendants' behavior affected the VIX.

The other major issue raised by the defendants is whether a claim for manipulation can be made when the plaintiff alleges that manipulation occurred in a market or of an instrument different than the one plaintiff traded in. [180] (Two Roads) at 52. Defendants read *Harry v. Total Gas & Power North America, Inc.*, to require a "rule-based linkage" between the two products, but the text of the opinion reads: "Alternatively a plaintiff could allege that she traded (at a detriment) in a contract the price of which was tied, via explicit agreement or other mutual understanding, to the price of a contract that a defendant was plausibly manipulating. Commodity and derivative contracts that index their price formulae to prices of other contracts are linked in a rule-based manner [ ]." *Total Gas*, 889 F.3d at 113. This language suggests that either "explicit agreement or other mutual understanding" is an acceptable connection between the two products. The court goes on to say, "where the connection between two contracts is not well established or readily discernible from a basic description of them and the exchanges over which they are traded, a plaintiff will have to elaborate some other tangible mechanism whereby a defendant's trading affects her more than marginally." *Id*.

Plaintiff has met its burden of describing how manipulation of the VIX and prices of SPX Options affected prices of options of S&P 500 Futures and E-minis. Plaintiff alleges that "[b]ecause (1) the underlying instrument of options S&P 500 Futures is the S&P 500 Futures contract, (2) the S&P 500 Futures contract is directly

proportional (at five times the size) to the E-minis contract, and (3) the E-minis contract moves in lockstep with the S&P 500 (and thus SPX Options), it follows that all three move in tandem []." [152] (Two Roads) ¶ 60. Plaintiff alleges that "market participants consider SPX Options and Options on S&P 500 Futures to be equivalent and directly correlated instruments." *Id.* ¶ 61. Plaintiff also alleges that the S&P 500's expected volatility affects all three instruments and include a table that shows how a change in volatility affected the prices of the three instruments in a nearly identical manner. [152] (Two Roads) ¶¶ 62–63, Table 1. Plaintiff pleads an established connection between the prices of the three instruments and the VIX (as a measure of the S&P 500's expected volatility).[11] This is sufficient at the pleading stage to show "the effect in the marketplace."

In order to show that it traded at manipulated prices to its detriment, Two Roads points to its allegations that it held a net short put position in options on S&P 500 Futures at the beginning of the day on February 5, 2018, and that as it adjusted to the increased volatility in the market, it had to make adjustment trades at artificially high prices. [192] (Two Roads) at 50. Plaintiff alleges that it was "forced

---

[11] Plaintiff's allegations about the relationship between the three financial instruments (and the VIX) go beyond the diffuse relationship in *Total Gas* between the defendants' alleged manipulation of prices at regional natural gas hubs and plaintiffs' natural gas derivative contracts, which were based on the price of natural gas at the central national hub. *Total Gas*, 889 F.3d at 108–109, 114–15. Defendants also argue that plaintiff's allegation that market makers use the price of E-minis to calculate the price of SPX options precludes plaintiff from arguing that quotes on SPX Options could affect the price of E-minis. [180] (Two Roads) at 24. But the plaintiff also alleges that both options on S&P 500 Futures and E-minis are affected by expected volatility of the S&P 500, which the market measures through the VIX (calculated using SPX Options midpoints). *See* [152] (Two Roads) ¶¶ 60–63, Table 1, 67.

to buy offsetting call options on S&P Futures and E-minis at adverse (i.e., artificially high) prices and sell put options on S&P 500 Futures and E-minis at adverse (i.e., artificially low) prices." *Id*. at 51 (citing to [152] (Two Roads) ¶¶ 91, 94, 99, 101). Specifically, Two Roads alleges "as a result of Defendants' manipulative quotes on SPX Options … the Preservation Fund transacted options on S&P 500 Futures at artificial and inflated prices and had the value of its open short positions in the same significantly devalued." [152] (Two Roads) ¶ 95. I find that this is sufficient, at this stage, to allege that plaintiff was injured by trading in instruments affected by defendants' manipulation. This is especially so because there is no securities-like loss causation requirement for this claim. *See Total Gas*, 889 F.3d at 113 n.4 ("We do not impose a loss causation requirement, which would mandate demonstrating losses in specific trades. We have never imported loss causation from the securities context and we do not begin to do so with this case.").

Defendants argue that Two Roads only alleges that the VIX was artificially elevated for five minutes during the February 5 and 6, 2018, and that because plaintiff fails to allege that it made trades at those times it has failed to allege actual damages. [180] (Two Roads) at 50. I read plaintiff's complaint to allege that the VIX, and therefore the prices of the derivatives in which Two Roads traded, was artificially high for the entire afternoon of February 5 and morning of February 6, 2018. This is a significantly shorter period of time than the eight years (or even nine separate days) at issue in *Gamma Traders-I, LLC v. Merrill Lynch Commodities*, where the court found that plaintiffs had failed to point to "specific manipulated transactions or set

38

of transactions" to support their CEA manipulation claim. *Id.*, 41 F.4th 71, 76–81 (2d Cir. 2022). Plaintiff adequately alleges that it made trades, to its detriment, during the afternoon of February 5th and morning of February 6th when the VIX was artificially high due to defendants' manipulation.

## IV. Conclusion

LJM has not adequately alleged that it was injured to support Article III standing and its complaint is dismissed without prejudice for lack of jurisdiction, but without leave to re-plead because amendment would be futile on statute of limitations grounds. Two Roads has adequately pleaded a manipulative device under the CEA, and ordinarily, the defects in pleading intent for price manipulation might be cured in an amended complaint. But the statute of limitations would remain a barrier to proceeding. The parties have fully briefed the prospect of equitable tolling, and Two Roads is not entitled to equitable tolling. Two Roads's complaint was filed outside of the statute of limitations for CEA claims and Two Roads's complaint is dismissed with prejudice, because amendment would be futile. Defendants' motions, [172], [175] (LJM) and [179], [182] (Two Roads) are granted. Enter judgment in favor of defendants in both cases and terminate civil cases.

ENTER:

Manish S. Shah
United States District Judge

Date: September 28, 2023

39